# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HILLSIDE PRODUCTIONS, INC., GARY
RONCELLI and JOSEPH VICARI,

      Plaintiffs/Counter-Defendants,

                          Case No. 06-CV-11566-DT

v.

COUNTY OF MACOMB,

      Defendant/Counter-Plaintiff.[1]
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before the court are the parties' cross-motions for summary judgment, which were both filed on October 31, 2007. The court heard argument on these motions on December 19, 2007. For the reasons stated below, the court will grant in part and deny in part Plaintiffs' motion and grant in part and deny in part Defendant's motion.

## I. BACKGROUND

This case may provide a cautionary tale of entanglements and unintended consequences that can follow when a government seeks to enter the marketplace of competitive commerce. The parties entered into an agreement on May 19, 1999 that called for Defendant Hillside Productions, Inc. ("Hillside")[2] to operate the Freedom Hill

_____

[1]Because, pursuant to the analysis below, only Defendant Macomb County is properly before the court, the court will dispense with its previous plural designation for Defendants and simply refer to Defendant.

[2]Plaintiffs Gary Roncelli and Joseph Vicari are the owners of Hillside.

Amphitheater ("the Amphitheater"), which is located on publically-owned[3] Freedom Hill County Park ("the Park"), and to share certain revenue with Defendant. On March 21, 2000, the parties amended the agreement and extended its term of years. The parties amended the agreement a second time on March 29, 2001. The final relevant contract is the May 10, 2001 agreement for food and beverage service, which granted Hillside an exclusive license to provide such service at the Independence Building on the grounds of the Park. These agreements are the basis of the parties' relationship and the subject of this litigation. The court has already interpreted certain provisions of the parties' contracts. For sake of clarity and brevity, the court will present relevant factual background within its discussion of the various issues that the motions raise.

The parties' business relationship has gone from successful to strained, and prompted Plaintiffs to file this lawsuit on March 31, 2006. Defendant filed a counterclaim on May 8, 2006. Through the course of motion practice, the parties have obtained leave to amend their respective claims. Plaintiffs allege the following counts:

I. Deprivation of Rights in Violation [sic][4] of 42 U.S.C. § 1983,

    a. Fourteenth Amendment Due Process,

    b. Fourteenth Amendment Equal Protection,

    c. Retaliation for Exercise of First Amendment,

---

[3]Plaintiff's complaint states that Huron-Clinton Metropolitan Authority has owned the Park since 1972 subject to the lease interest that Defendant Macomb County holds. (Pls.' Am. Compl. at ¶ 7.)

[4]Section 1983, in fact, is not itself a source of any substantive rights, and is not capable of being "violated." Rather, it provides the means by which rights conferred elsewhere may be enforced or violations thereof redressed. *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979).

II.  Unlawful Conspiracy in Violation of 42 U.S.C. § 1985(3),

III.  Unlawful Conspiracy in Violation of 42 U.S.C. § 1986,

IV-V.  Breach of Contract.

(Pls.' Am. Compl.)  Defendant's counterclaim asserts (1) Declaratory Relief, (2) Breach

of Contract, (3) Fraud Based on False Representation, (4) Negligent Misrepresentation,

(5) Innocent Misrepresentation, (6) Unjust Enrichment and (7) Breach of Fiduciary Duty.

(Defs.' Am. Counterclaim.)[5]  The court's analysis will consider each count in turn, as

both motions seek complete dismissal of the other parties' claims.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when

there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary

judgment, the court must view the evidence in the light most favorable to the non-

moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United

States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its

burden of showing that the pleadings, depositions, answers to interrogatories,

admissions and affidavits in the record, construed favorably to the non-moving party, do

not raise a genuine issue of material fact for trial, entry of summary judgment is

appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317 (1986)).

---

[5]Defendant's eleven-count counterclaim repeats certain counts depending on which contract is implicated.

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  They must put forth enough evidence to show that there exists a genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'") (emphasis and alteration in original) (citation omitted).  A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

### III.  DISCUSSION

**A. Defendant Macomb County Parks and Recreation Commission ("MCPRC")**

As an initial matter, the parties contest whether the MCPRC can be sued in its individual capacity. Counties in Michigan are authorized by statute to "create a county parks and recreation commission, which shall be under the general control of the board of commissioners." Mich. Comp. Laws § 46.351(1). Such a commission is "an agency of the county" and subject to the rules and regulations of the county board of commissioners. § 46.351(4). Defendant cites federal case law in which courts have dismissed suits against county or city police departments because they are not considered separate legal entities apart from the county or city. *See e.g. Sumner v. Wayne County*, 94 F. Supp. 2d 822, 827 (E.D. Mich 2000); *Haverstick Enter. v. Fin. Fed. Credit, Inc.* 803 F. Supp. 1251, 1256 (E.D. Mich 1992); *Hughson v. County of Antrim*, 707 F. Supp. 304, 306 (W.D. Mich 1988) ("Since the sheriff's department and prosecutor's office do not exist, they obviously cannot be sued.").

Plaintiffs, meanwhile, rely upon Michigan case law that has recognized claims against, and counterclaims by, county parks and recreation commissions. *See e.g. Park Trustees for Cass Cty. v. Wendt*, 105 N.W.2d 138 (1960); *Sanders v. Wayne County Parks*, No. 234643 (Mich. Ct. App. Dec. 17, 2002); 2002 WL 31955252. The court finds little support in either of these for Plaintiffs' proposition. Almost fifty years ago, in *Park Trustees*, neither standing to sue nor the exact nature of the plaintiff entity were at issue. The Court, in the words of the dissenting Justice, nonetheless referred to the plaintiffs as "[t]he plaintiff authorities, *representing Cass county* . . . ." *Park Trustees*, 361 Mich. at 252 (emphasis added), providing an indication that the Court believed that the county was the real party in interest. Similarly, in *Sanders*, the corporate nature of

the defendant was neither argued nor decided. Plaintiff there was said to have been employed by the defendant, denominated "Wayne County Parks." As there is no explanation in *Sanders*, the court is left only to assume that "Wayne Court Parks" constituted a "county parks and recreation commission" under the general control of the board of commissioners pursuant to Mich. Comp. Laws § 46.351(1).

The court finds more guidance in the opinion of the Sixth Circuit as it affirmed in *Haverstick*, reasoning that "a suit against a city police department in Michigan is one against the city itself, because the city is the real party in interest" because "a municipal police department is a creature of the municipality." *Haverstick*, 32 F.3d at 992 n.1 (citations omitted). The court here gleans from the statutory framework that MCPRC, an "agency" created – and subject to dissolution – by a two-thirds vote of the Board of Commissioners of Macomb County, and subject to the "rules and regulations" of the Macomb County Board of Commissioners, is a "creature of the municipality," *id.*, and that it has no independently-derived powers or duties. The record known to the court is silent regarding any possible MCPRC separate budgetary authority, source of power or funding, or in what way its interests might to any degree differ from those of the county. The court therefore concludes that Macomb County is the only real municipal party in interest in this case. Given the statutory framework, the court finds the same predicate absence of separate "existence," so to speak, that underpinned the analysis in *Hughson*. 707 F. Supp. at 306 (holding that sheriff and prosecutor are designations for county officers created in Michigan's constitution and therefore "there does not exist a

sheriff's department or a prosecutor's office.")  The court will grant Defendant's motion

to dismiss all claims against MCPRC.[6]

## B.  Plaintiffs' Claims Under 42 U.S.C. § 1983

### 1.  Due Process

#### a.  Substantive Due Process

The court previously held that Plaintiff may not seek to invalidate its bargained-

for contracts on the grounds of duress or other alleged pressure that "forced" Plaintiffs

to enter into one or more agreements with Defendant.  (6/14/07 Order at 10.)  Plaintiffs

acknowledge this state of affairs and abjure all contract-based theories of duress.  (Pl.'s

Resp. at 3.)  Rather, Plaintiffs contend that there is a question of material fact

concerning whether Defendant's "pattern of arbitrary, capricious and extortionist activity

against plaintiffs" violated Plaintiffs' substantive due process rights.  (*Id.*)

Substantive due process protects against certain deprivations of property that are

"subject to limitations regardless of the adequacy of procedures employed."  *Buckeye

Comm. Hope Found. v. City of Cuyahoga Falls*, 263 F. 3d 627, 641 (6th Cir. 2001).

Substantive due process rights protect against arbitrary or capricious state action.

*Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992).  The court agrees

with Plaintiffs that the "shock the conscience" standard argued by Defendant is

unhelpful, as the Sixth Circuit has held that application of this standard outside of the

---

[6] This point is mooted in substance by Plaintiffs' concession at argument that they can obtain full relief, and accordingly have no concern about, proceeding against only the county defendant so long as the county does not attempt to foist off onto a now-absent defendant its responsibility. Counsel for Defendants assured the court and Plaintiffs on the record that this would not be done.

context of excessive force is problematic.  *Id.* (citing *Cassady v. Tackett*, 938 F.2d 693, 698 (6th Cir. 1991)).  The touchstone is, rather, whether a factfinder could reasonably conclude that Defendant acted arbitrarily and capriciously.

Viewed in the light most favorable to Plaintiffs, the record could support a reasonable factfinder's determination that Defendant acted arbitrarily and capriciously with respect to its dealings with Plaintiffs and the amphitheater.  Plaintiffs offer two examples in their response: (1) Defendant's allegedly unreasonable withholding or delay of consent for Plaintiffs to assign their interest in the Amphitheater agreements and (2) Defendant's sudden decision to withhold parking revenue in contravention of the parties' contract.[7]  Regarding the latter, the court already determined that Plaintiffs' position was the only reasonable interpretation of the revenue-sharing for which the contract provided.  (3/26/07 Order.)  The contract is clear and the factfinder could therefore reasonably infer that Defendant acted arbitrarily or capriciously when they reversed course and attempted to limit the revenue sharing to Hillside-sponsored events even though nothing in the contract support such a distinction.[8]

---

[7]In addition, as discussed below in the context of Plaintiffs' breach of contract claim, there is evidence in the record to suggest that Defendant breached the food and beverage agreement by withholding consent for minor improvements to Independence Hall in an effort to link that consent with renegotiation of the parking revenue split.  This allegation, if proven, would also tend to support Plaintiffs' substantive due process claim.

[8]In a separate order settling a discovery dispute, the court concluded that the record could not support a finding that a majority of the MCPRC relied upon the advice of counsel when it voted to breach the contract and withhold parking revenue to which Plaintiffs were clearly entitled.  (11/6/07 Order at 7-11.)

Further, a finder of fact could infer that Defendant acted in a way that would create disruption or problems for Plaintiffs, forcing them to make concessions to Defendant or otherwise renegotiate from a position of weakness.[9] Indeed, when Plaintiffs sought consent to assign their interest, certain county officials publicly voted to postpone the matter, "open the contract and renegotiate the lease." (10/18/05 Operational Services Committee Minutes at 5, Pls.' Resp., Ex. 37.)[10] Elsewhere, Defendant is described as "hatching this little plot to bring Gary [Roncelli] and Joe [Vicari] back to the table." (Riberas Dep. at 204-05, Pls.' Resp., Ex. 3.) A favorable view of the facts would also give Plaintiffs a timeline indicating Defendant's awareness of sensitive negotiations between Plaintiffs and PSE Hillside[11] for PSE Hillside to pay a substantial sum to acquire Hillside's interests in the Amphitheater. As such, Plaintiffs would be particularly vulnerable to Defendant's interference.[12] Plaintiffs' theory of the case rests in large part upon an unfavorable pattern of Defendant's behavior. The

---

[9]Though the court previously rejected Plaintiff's theory of duress as a grounds for unenforceability of the sublease agreement, the court did not reach Plaintiff's other theories of recovery, "including, for instance, alleged lost business and other claimed consequential damages." (6/14/07 Order at 10.)

[10]The court recognizes that a member of a committee of MCPRC does not speak for MCPRC as an entity. But a factfinder could reasonably rely in part upon such evidence to conclude that Defendant acted arbitrarily and capriciously.

[11]PSE Hillside is the entity that was created when Palace Sports Entertainment entered into an "Asset Purchase Agreement" with Plaintiff Hillside related to the Amphitheater.

[12]The court expresses no opinion concerning Defendant's argument that the PSE Hillside deal could have fallen through for other reasons that have nothing to do with Defendant's alleged misconduct. Defendant raises a question of fact that could aid in its defense, not a ground for judgment as a matter of law.

record before the court and the standard of review by which the court must evaluate the record support Plaintiffs' theory.

Plaintiffs' theory is not a garden-variety breach of contract case that would give rise to no constitutionally protected property interest. *See e.g. Bowers v. City of Flint*, 325 F.3d 758 (6th Cir. 2003). The damage that was allegedly inflicted goes beyond what a state law breach of contract could remedy. Here, Plaintiffs' theory of the case, if proven, would tell a story of a local government forcing a business venture to respond to the government's whims about revenue-sharing and regarding whether the venture could ever sell to a higher bidder and walk away from the venture's entanglement with an unpredictable and unchecked associate.[13] In sum, there is sufficient basis in the record for the court to find a question of material fact concerning whether Defendant acted arbitrarily and capriciously to violate Plaintiffs' substantive due process rights. Plaintiffs have a colorable claim that their substantive due process rights were violated.

### b. Procedural Due Process

Plaintiffs' procedural due process claim appears limited to MCPRC's decision on March 23, 2006 to withhold parking revenues. (Pl.'s Am. Compl. at ¶¶ 64, 67; Pl.'s Resp. at 16-19.) To state such a claim under § 1983, Plaintiffs must demonstrate (1) a protected property interest, (2) deprivation of this protected interest and (3) that the state did not provide adequate procedural rights prior to deprivation. *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (citation omitted). Pursuant to the above

---

[13]It is also worth mentioning that there was no end in immediate sight to the parties' difficult business dealings, as the amendment to the sublease agreement extends their business relationship to December 31, 2020. (Amendment to Sublease at 1, Pl.'s Mot. Ex. 2.)

analysis and the analysis of the court's June 14, 2007 order, the first two conditions are met. The court finds that there is no question of fact concerning the third condition, as Plaintiffs did not avail themselves of all accessible procedures.

After the vote, Plaintiffs objected in a letter to Defendant's corporation counsel. (3/24/07 Letter, Pls.' Am. Compl. Ex. L.) A few days later, MCPRC invited representatives of Hillside to a meeting to discuss, among other things, Amphitheater parking fees. (3/28/07 Letter, Pls.' Am. Compl. Ex. M.) Plaintiffs chose not to attend, concluding that such a meeting would be futile. (Riberas Dep. at 203-04, Pls.' Resp., Ex. 3.)[14] Plaintiffs further argue that their March 24, 2007 letter was not distributed to MCPRC members until March 30, 2007, that no one ever responded to the letter and that the MCPRC never took corrective action on the parking issue. (Pl.'s Resp. at 18.) Plaintiffs argue that procedural due process claims are instantly cognizable and that they did not have to exhaust all avenues before the MCPRC or the County before filing suit. (Pl.'s Resp. at 18.)

The authority Plaintiffs cite fails to fully support their position. In *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890 (6th Cir. 1991), the plaintiff was not given a public hearing where he could challenge the re-zoning of his property. 949 F.2d at 893. The court distinguished zoning decisions, which have an immediate effect, from diminution in value cases, which cannot be assessed until a final decision is

_____

[14]Further, the record indicates that after Hillside did not appear at this meeting, MCPRC scheduled another meeting for April 3, 2006, which Plaintiffs also did not attend. (3/28/06 MCPRC Meeting Minutes at 2, Defs.' Reply Br. Ex. A.)

reached. *Id.* at 894. Similarly, *Seguin v. City of Sterling Heights*, 968 F.2d 584, 589 (6th Cir. 1992), concerned a challenge to a zoning ordinance.

In this case, however, harm could not accrue to Plaintiffs until after parking revenue was collected, accounted for, divided and paid. Plaintiffs therefore had the opportunity to challenge MCPRC's decision before it could go into effect. Indeed, MCPRC proposed a meeting with Hillside's representatives. Plaintiffs decided not to attend or to otherwise, short of filing suit, avail themselves of any procedure to challenge the parking determination. Whatever the substantive character of MCPRC's decision, as the court discussed above, the court finds no question of material fact regarding whether Plaintiffs were afforded adequate procedural protection. They were.

Further, to the extent that Plaintiffs' substantive due process claim depends upon an alleged pattern of Defendant's putative misconduct, Plaintiffs' reliance on one instance of that pattern fails to create a question of material fact concerning procedural due process. Additionally, the court understands a hallmark of Plaintiffs' substantive due process claim as alleged abuse of the proper procedures that resulted in arbitrary and capricious local government action. While the court is required to view the facts in the light most favorable to Plaintiffs, it is not required to turn a blind eye to the logical inconsistency of claims for relief that appear mutually exclusive. The court will therefore grant summary judgment to Defendant for this count.

### 2. Equal Protection

The court is at a loss to understand what equal protection rights Plaintiffs seek to vindicate. Plaintiffs allege not that they are members of any protected group, but rather that they have been singled out as a "class of one" in violation of their equal protection

rights.  Plaintiffs find some support for this theory in the case law, primarily in *Futernick*

*v. Sumpter Twp.*, 78 F.3d 1051 (6th Cir. 1996).  The core of *Futernick* was the claim of

the plaintiff, a mobile home park owner, that selective enforcement of Michigan state

environmental regulations violated his equal protection rights.  *Id.* at 1056.  Apart from

regulatory enforcement, the Sixth Circuit noted that such cases typically arise as a

defense in a criminal prosecution.  *Id.*  Those two categories of cases bear no

resemblance to the instant case.  Put differently, the court is left asking, selective

enforcement of what?  In the absence of a criminal law or a regulatory framework,[15] the

court will not speculate regarding what predicate Plaintiffs have for their theory of

selective enforcement.[16]  Furthermore, the court will not deny summary judgment, as

Plaintiffs urge, on the grounds that Defendant allegedly did not treat other tenants the

same way.  Plaintiffs lack evidence in support of this contention and offer to

"supplement this information upon being permitted to complete [a] deposition," (Pls.'

Resp. at 20 n.6.), which the court does not find necessary at this point.

 If anything, Plaintiffs' First Amendment retaliation claim subsumes their equal

protection theory.  Plaintiff's appear to claim only "second type" of selective enforcement

according to *Futernick*.  (Pl.'s Resp. at 19.)  This kind of claim requires (1) exercise of a

---

[15]At first blush, the parties' relationship may seem regulatory, but the record
supports a characterization that is more business or contract-oriented.  The parties'
disputes find their genesis in dealings that touch upon contract and tort, not
governmental regulation of business, the environment and the like.

[16]The Sixth Circuit found in *Futernick* that no equal protection rights were
violated, as the plaintiff had failed to demonstrate a forbidden aim behind his
prosecution.  78 F.3d at 1060.  "Absent a breakdown in the state's normal political
process that unfairly affects a protected group or the exercise of constitutional rights, we
can and should trust states to police adequately their own processes."  *Id.* at 1059.

protected right, (2) the enforcer's "stake" in the exercise of that right, (3) the unreasonableness of the enforcer's conduct and (4) that the enforcement was initiated with the intent to punish the plaintiff for exercise of the protected right. *Futernick*, 78 F.3d at 1056 n.7. To the extent that Plaintiffs rest this theory upon their First Amendment claim of retaliation for filing suit, the court must turn to Plaintiffs' next claim. Pursuant to the above analysis, the court sees no other basis for Plaintiffs' equal protection claim.

### 3. First Amendment Retaliation

Plaintiffs allege that Defendant, after Plaintiffs filed suit, sought to punish Plaintiffs by (1) refusing to provide security outside of the fenced Amphitheater area for Hillside-sponsored events, (2) refusing to provide security and parking services for high school graduation ceremonies that Hillside sponsored, (3) attempting to engender a public safety mishap by refusing to provide traffic, parking and security services so that high schools would choose not to book in future years and (4) falsely and wrongly telling members of the media that Hillside had shredded documents in an attempt to defraud Defendant. (Pl.'s Am. Compl. at ¶ 73.)

Plaintiffs' claim for retaliation requires that (1) Plaintiffs engaged in protected conduct, (2) Defendant took an adverse action against Plaintiffs that would deter a person of ordinary firmness from continuing to engage in that conduct and (3) there is a causal connection such that the protected conduct was a substantial or motivating factor in the adverse action. *Brandenberg v. Housing Auth. of Irvine*, 253 F.3d 891, 896 (6th Cir. 2001). The First Amendment protects the right to petition the government and the right to have access to the courts. *Gilliard v. Norris*, 857 F.2d 1095, 1011 (6th Cir.

14

1988).  Thus, Plaintiffs meet the first element because they allege retaliation for having accessed the courts and filed suit.  Plaintiffs' claim fails, however, on the second element.

Without minimizing the seriousness of the retaliation that Plaintiffs claim, there can be no question of fact that it pales in comparison to the multi-million-dollar controversy that Plaintiffs seek to settle in this suit.  It is in this context that the court must evaluate whether Defendant's retaliatory acts, if proven, would deter a person of ordinary firmness from pursuing a multi-million-dollar claim.  Viewed in the light most favorable to Plaintiffs, the record before the court evinces large business interests pitted against allegedly recalcitrant local government acting (or perhaps failing to act) as a business partner.  Given the posture of the parties and the amount of money at stake, the corresponding retaliation would have to be severe to deter a person of ordinary firmness from filing suit.  The alleged retaliation, while not inconsequential, falls far short of severe.  A person of ordinary firmness in the position of Plaintiffs was headed to the courthouse, with or without the alleged retaliation, for there was too much to lose (or not gain) otherwise.  Moreover, the risk extended to at least the end of 2020 according to the most recent extension of the parties' business relationship.  Accordingly, the court finds as a matter of law that Plaintiffs present no question of material fact concerning the second element of their First Amendment retaliation claim.[17]  In turn, Plaintiffs' claim of denial of equal protection by selective enforcement also presents no genuine issue of

---

[17]The court therefore need not reach the third element of Plaintiffs' claim regarding whether Plaintiff's filing of this suit was a substantial or motivating factor for the alleged adverse action.

material fact.

## C.  Plaintiffs' Claims Under 42 U.S.C. § 1985(3)

Plaintiffs claim Defendant conspired "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ."  42 U.S.C. § 1985(3).  The statute further proscribes "any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States . . . ."  *Id.*  The Sixth Circuit has interpreted this statute to require "(1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States."  *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994).  Plaintiffs cannot establish the first or the second requirements.

The Sixth Circuit has held that a conspiracy cannot exist between a city and one of its officers acting in his official capacity because "an entity cannot conspire with its own agents or employees." *United Food & Comm'l Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 753 (6th Cir. 2004).  Pursuant to Mich. Comp. Laws § 46.351(4), MCPRC is an agency of Macomb County.  There could therefore have been no conspiracy between these two putative defendants.[18]  To the extent that individuals may have conspired, there are no individually-named defendants and each individual was

---

[18]The question raised here is distinct from the court's previous analysis about whether MCPRC exists as a separate legal entity.

admittedly an agent of either Macomb County or MCPRC. Even if the individuals acted

outside of their official capacity and the so-called "intra-corporate conspiracy doctrine"

does not apply, Plaintiffs cannot demonstrate that any conspiracy was for the purpose

of depriving Plaintiffs of the equal protection of the laws. Pursuant to the court's above

analysis, Plaintiffs have no viable equal protection claims. Because violations of due

process do not fall under the plain terms of § 1985, Plaintiffs present no question of

material fact with respect to this statute. The court will therefore grant Defendant

summary judgment on this claim.

### D. Plaintiffs' Claims Under 42 U.S.C. § 1986

This statute provides for a cause action against those who had the power to

prevent a § 1985 conspiracy yet neglect to do so. 42 U.S.C. § 1986. Such actions are

therefore entirely derivative of § 1985 conspiracies. This claim must therefore fail along

with Plaintiffs' § 1985 claim. *See e.g. Bass v. Robinson*, 167 F.3d 1041, 1050 n.5 (6th

Cir. 1999) (citing *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir. 1990).)

### E. The Parties' Breach of Contract Claims[19]

### 1. Parking Revenue

Pursuant to the court's analysis in its March 26, 2007 order, Defendant breached

Paragraph 2 of the sublease agreement by not honoring the 75%-25% split of parking

---

[19]To the extent that the parties' cross-motions seek summary judgment on the same contracts, the court must balance the standard of review and, with respect to each sub-issue, view the facts in the light most favorable to the non-moving party. Despite some contrary indications at the hearing, the parties' motions seek summary judgment on all claims and counterclaims in both the defensive and offensive senses. The court's analysis will mainly refer to whether there is a genuine question of material fact without dissecting what defensive or offensive relief is appropriate as a consequence of that determination. It should be apparent where dismissal or recovery are warranted.

revenue for all events at the Park. (6/14/07 Order at 4-6.)[20] According to the relevant

contractual language:

> The County shall continue to collect the parking fees for all events at Freedom Hill County Park, including the Freedom Hill Amphitheater. The determination of parking rates shall be made mutually by the County and Hillside. Parking revenues shall be divided on the following basis during the remaining term of the Sublease Agreement; 75% to Hillside; 25% to the County; provided, however, Hillside guarantees the County shall receive parking revenues in the minimum amount of $125,000 per year during the remaining term of the Sublease Agreement.

(Second Am. to Sublease Agreement at ¶ 2, Pls.' Mot. Ex. 3 (emphasis added).)

The March 23, 2006 vote of MCPRC violated this part of the sublease agreement. The

court rejects Defendant's argument that funds were merely withheld for accounting

purposes, which gives rise to no breach of contract. (Defs.' Br. at 64.) The record

manifestly contradicts Defendant's claim that funds were to be withheld pending

accounting. There was instead MCPRC's newly asserted claim of right to the funds, a

claim that contravened the contract. Further, even if the record supported Defendant's

more charitable characterization, Defendant cites no part of the contract that would

allow such withholding, nor is there any mention of how long a period would be required

for an accounting that seemed to take place previously without a period of withholding.

Plaintiffs are therefore entitled to summary judgment for this breach of contract.

---

[20]As the court stated in its previous orders interpreting the contractual language, contracts formed in the State of Michigan are interpreted under Michigan law, which states that "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998) (quoting *Rasheed v. Chrysler Corp.,* 517 N.W.2d 19, 29 n. 28 (Mich. 1994)). This court "must look for the intent of the parties in the words used in the instrument." *Id.* (citing *Michigan Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941)). If a contract is ambiguous, the court decides as a matter of law what extrinsic evidence may be considered to determine the intent of the parties. *Id.* at 373.

With respect to Defendant's allegations that Plaintiffs may have collected or foregone parking revenues in other ways (season ticket sales, VIP arrangements, valet service, etc.) and not shared revenue to the detriment of Defendant, the court finds that there are questions of material fact. In particular, it is unclear if Plaintiffs obtained any parking revenue from valet parking. Deposition testimony indicates that a third party provided the service, which may or may not have been paid for as a part of season ticket packages. (Cairns Dep. at 127-28, Pls.' Reply Br. Ex. 2.) Other deposition testimony indicates that the valet service collected a flat five-dollar charge per car and that the valet paid no money to Hillside. (Cloin Dep. at 25-29, Defs.' Reply Br. Ex. B.) There is thus a question of fact regarding whether Plaintiffs breached the contract by collecting money for valet parking without paying Defendant its share.

Similarly, parking revenue that was foregone because Plaintiffs offered customers complimentary tickets with no charge for parking may also constitute a breach of the contract. The contract provides that "[t]he determination of parking rates shall be made mutually by the County and Hillside." (Second Am. Sublease at ¶ 2, Pls.' Mot. Ex. 3.) Further, the contracts are generally silent about the right of either party to offer complimentary tickets, parking or other goods and services. Importantly, the parties' definition of gross ticket revenue - but not the definition of parking revenue - excludes "any amounts for, parking, VIP or hospitality services, or any similar charges." (*Id.* at ¶ 3.) This exclusion contemplates certain charges, but it does not specify whom to charge - customers, or perhaps lost revenue for Plaintiffs or Defendant. Given the ambiguity of the contract, the parties' course of conduct is relevant. *See e.g. Detroit Greyhound Employee Fed. Cred. Union v. Aetna Life Ins. Co.*, 167 N.W.2d 264 (Mich.

19

1969).  As a factual matter, it is not clear from the record whether or to what extent the parties' course of conduct allowed one party to in effect diminish the other party's revenue by waiving charges that would otherwise apply.  The parties are left to their proofs at trial.  This analysis applies equally to Defendant's counterclaim for allegedly unpaid gross ticket revenue and advertising revenue.

Finally, the court rejects Plaintiffs' argument that Defendant accepted past revenue and therefore the doctrine of accord and satisfaction precludes them from seeking recovery for breach of contract.  The elements of accord and satisfaction are (1) a good faith dispute over the amount of the unliquidated claim, (2) substituted performance that is tendered and accepted and (3) valuable consideration.  Mich. Comp. Laws § 440.3311; *Baum's Dairy Farms, Inc. v. United States*, 996 F.Supp 705, 711 (E.D. Mich. 1998) (citing *Gitre v. Kessler Prod. Co.*, 198 N.W.2d 405 (Mich. 1972)) (other citations omitted).  In this case, the record offers no basis for the first element, as the parties had no good faith dispute about the amount of parking revenue until the eve of the filing of Plaintiff's complaint.  Defendant's theory of breach, rather, is that Plaintiffs have been underpaying and that only recent discovery has illuminated the situation. There is no question of fact that the parties lacked an earlier dispute and therefore there could have been no accord and satisfaction.[21]  Therefore, the court need not reach the question of whether Defendant's agent was authorized to accept satisfaction on behalf of Defendant.

---

[21]This conclusion applies equally to the other forms of revenue that Defendant claims Plaintiffs have wrongfully withheld.

## 2. Security

Plaintiffs also claim that Defendant's refusal to provide security and other services in 2006 constitutes a violation of the sublease agreement. (Pls.' Am. Compl. at ¶ 102.) According to the parties' initial contract, Hillside is "responsible for hiring and providing all security inside the premises and [Macomb County] shall be responsible for hiring and providing all security outside the premises for all events scheduled by [Hillside]." (Sublease Agreement at ¶ 15, Pls.' Mot. Ex. 1.) The contract defines "premises" as the area "[c]ommonly designated as the 'Hill Amphitheater.'" (*Id.* at 2.) There is no specific definition of security, which is relevant because the parties dispute whether that contractual term encompasses "traffic control" inside and in the immediate area of the Park. Further, Plaintiff Vicari estimated that fifteen or more officers, including mounted police and police on motorcycles, were stationed at or near the Amphitheater in the past, but that after the filing of the lawsuit this number fell to two or fewer. (Vicari Dep. at 116-17, Pls.' Resp, Ex. 21.) The court finds that there is a question of fact concerning whether Defendant breached the contract by failing to provide security pursuant to paragraph 15.

## 3. Advertising Sales

The sublease provides that Hillside and Macomb each receive "50% of all revenues from Metroparkway spectacular sign advertising [and] 50% of all other advertising revenues generated outside the premises." (Sublease at ¶ 4, Pls.' Mot. Ex. 1.) As a necessary corollary, Plaintiffs retain 100% of all advertising revenue generated within the premises. With respect to breach of contract, Defendant contends that Plaintiffs did not disclose a full accounting of collected revenue that should be shared

21

and that certain inconsistencies suggest that Plaintiffs withheld advertising revenue that should have been shared.

Having reviewed the record, the court finds support for and against Defendant's position. Michael Cairns testified that he made "the list" available to Robert Grzanka, Defendant's agent, to review and he would pick and choose which sponsorship or advertising agreements to see. (Cairns Dep. at 149-50, Pls.' Reply Br. at Ex. 2.) Defendant contends in its reply brief that Cairns only presented a "sample" of the relevant contracts, (Defs.' Reply Br. at 4), but the court finds no support for this contention in the deposition pages that Defendant cites. (Cairns Dep. at 38-40, Defs.' Reply Br. Ex. C.)

On the other hand, Defendant relies on a "Contract Checklist" (Exhibit 21) to support their contention that Jerome Duncan Ford actually paid $30,000 for a sign that is recorded elsewhere as $8,000. At the hearing, Plaintiff's counsel referred to deposition testimony stating that the higher figure was merely part of a wish list of hoped-for revenue and not an accounting of actual money received. Plaintiff's counsel conceded that such evidence relies upon a credibility determination of the witnesses and that there is thus a question of material fact. The court agrees and finds that neither side is entitled to summary judgment with respect to advertising revenue.[22]

---

[22]In addition, counsels' discussion at the hearing about a sign or banner for the valet parking suggests a question of fact concerning its location and what revenue, if any, it generated.

## 4.  Food and Beverage Agreement

Defendant claims that Plaintiffs failed to make payments pursuant to the food and beverage agreement. (Am. Counterclaim at ¶ 57.) The parties' dispute centers on the termination clause of the food and beverage agreement, which states that "[e]ither party may terminate this Agreement, upon ninety (90) days' written notice to the other party, for breach of any terms of conditions set forth herein." (Food and Beverage Agreement at ¶ 6, Pls.' Mot. Ex. 24.) Plaintiffs hand-delivered their notice of termination on July 5, 2005,[23] which outlined Defendant's alleged breach of the agreement. (7/5/07 Letter, Pls.' Mot. Ex. 25.) Plaintiffs alleged that Defendant withheld written consent for minor improvements to Independence Hall in an effort to link renegotiation of Amphitheater parking revenue sharing to the request for improvements. (*Id.*) Defendant does not respond to the substance of these allegations. The letter states that Hillside is terminating the agreement "as of the date of this letter." (*Id.* at 3.)

Because the terms of the agreement did not allow for immediate termination, the court must interpret the letter as ninety-day notice of termination. Defendant contends that Plaintiffs continued to host events at Independence Hall, including a wedding and Bible study group, and therefore have not acted in accordance with an intent to terminate. Plaintiffs counter that Defendant had no right under the contract to require Plaintiffs to cancel or reschedule an event for which a deposit was already paid and, further, that the Bible study group had no written contract with Plaintiffs but were instead at the hall with Defendant's blessing. Plaintiffs also argue that Defendant failed to mitigate its damages after the termination.

---

[23]The letter bears a corporation counsel "received" stamp of July 6, 2005.

Plaintiffs submit no evidence to corroborate that deposits were already paid for events that they hosted after July 5, 2005. Nor is the deposition testimony sufficiently unequivocal to support no question of material fact concerning the continued presence of the Bible study group. Mitigation of damages is a question of reasonableness under the circumstances, an inquiry that is typically the province of the finder of fact. The record before the court presents a question of fact concerning what steps, particularly with respect to obtaining a liquor license, Defendant should have taken. Further, the record is unclear regarding how cleanly Plaintiffs severed ties with Independence Hall and how thoroughly they effectuated "on the ground" the termination of which they sent Defendant notice on paper. These issues should proceed to the finder of fact. Defendant's claim for breach of contract for unpaid amounts due under the food and beverage agreement is not subject to summary judgment.

### F. Defendant's Fraud Claims

Defendant rests its fraud claims in Counterclaim Counts III-V on the allegation that Hillside represented "it would hold a limited number of events at the Amphitheater." (Am. Counterclaim at ¶¶ 36, 43, 50.) The record indicates that a representative of Hillside told MCPRC on September 27, 2000 that "there are 15-20 events being discussed for next summer." (9/27/00 MCPRC Minutes at 3, Def.'s Resp. Ex. 9.) Defendant contends that only after the second amendment to the sublease did they learn that Plaintiffs contemplated upwards of fifty events a season. (Def.'s Resp. at 33; 5/16/01 MCPRC Minutes at 5, Def.'s Resp. Ex. 10.) Without reaching Plaintiffs' argument that the statute of limitations bars any claim for this alleged misrepresentation, the court finds that such a statement would in any event not be actionable.

25

To sustain a fraud claim, Defendant must present allegedly false statements that relate to past or existing facts, not to future promises or expectations. *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 654, 658 (6th Cir. 2000). Further, reliance on the alleged misrepresentation must be reasonable. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 553-54 (Mich. Ct. App. 1999); *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994). In this case, "15-20 events being discussed for next summer" is in essence a projection of future business activity. It is not actionable as deliberate, negligent or innocent fraud.

Moreover, nothing within the parties' agreements suggests that the number of events was material to the parties' bargain. The court has difficulty understanding Defendant's theory of recovery. While it is true that more events mean more expense for Defendant, more events would presumably also generate more revenue that would cover such expenses. As a practical matter, Counterclaim Counts III-V present an unsustainable claim for damages that would in turn present no question of material fact. For these reasons, Plaintiffs are entitled to summary judgment for Counts III-V of the Counterclaim.

With respect to the food and beverage agreement, Defendant contends that Plaintiffs misrepresented in their pre-contract proposal to the MCPRC that they would aggressively advertise and promote the Independence Building. (Def.'s Resp. at 34.) Defendant's counterclaim, however, limits its claim for relief to the allegation that Plaintiffs said they "would make substantial improvements to the facility." (Am. Counterclaim at ¶¶ 61, 68, 75.) In the absence of evidence supporting the claim as it is plead, the court must find that Defendant presents no question of material fact and that

Plaintiffs are entitled to summary judgment. Indeed, the record instead indicates that Defendant frustrated Plaintiff's attempts to improve Independence Hall's facilities. (7/5/05 Letter, Pls.' Mot. Ex. 25.) Further, at this late juncture the court is not inclined to grant Defendant leave to amend the counterclaim under Federal Rule of Civil Procedure 15, which they did not seek before presenting in their response brief a claim that is nowhere to be found in the amended counterclaim. Plaintiffs are therefore entitled to summary judgment for Counterclaim Counts VII-IX.

### G. Defendant's Unjust Enrichment Claim

Plaintiffs argue persuasively that Defendant's claim for unjust enrichment cannot continue because courts will not grant relief under a theory of implied contract or equity where express contracts already cover the subject matter of the dispute. (Pls.' Mot. at 32-33 (citing *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (Mich. Ct. App. 1999); *Martin v. East Lansing Sch. Dist.*, 483 N.W.2d 686 (Mich. Ct. App. 1992); *Campbell v. City of Troy*, 202 N.W.2d 547 (Mich. 1972)). Defendant all but concedes that Counterclaim Count X is improperly before the court, arguing that they may plead in the alternative under Federal Rule of Civil Procedure 8. (Def.'s Resp. at 39.) Defendant is correct as a matter of initial pleading, but not in terms of the proper substantive outcome in this case. Defendant appears to assert Counterclaim Count X in an abundance of caution, recognizing the remote possibility that the court would find the contracts before it unenforceable or otherwise invalid. That remote possibility may save Defendant from Rule 11 sanctions, but Defendant should know that obviously untenable claims are to be withdrawn as soon as their futility is apparent, and not defended as theoretically

artful (but in reality unnecessary) pleading under Rule 8. Counterclaim Count X is subject to summary judgment in favor of Plaintiffs.

## H. Defendant's Breach of Fiduciary Duty Claim

Under the sublease, Plaintiffs are "the exclusive sales agent for all advertising at the Park." (Sublease at ¶ 7, Pl.'s Mot. Ex. 1.) Defendant contends that this provision created a fiduciary duty for Plaintiffs, which Plaintiffs breached by failing to obtain substantial advertising revenue for Defendant while generating such revenue for itself. (Am. Counterclaim at ¶¶ 87-92.) Depending upon the location of the advertising, Plaintiffs either evenly share the advertising revenue with Defendant or Plaintiffs keep the full amount. (Sublease at ¶ 4.) The court recognized Defendant's distinct theory of recovery when it granted Defendant leave to amend its counter-complaint. "[I]t appears to Defendant[] that Plaintiffs may have breached that [fiduciary] duty by maximizing advertising revenue, which Plaintiffs were not required to share under the agreement, without concomitantly cultivating other shared advertising revenue." (6/29/07 Order at 2.)

Plaintiffs challenge whether the contract gives rise to a fiduciary duty and, further, whether Defendant could have reposed any confidence and trust in Plaintiffs when the parties' interests were adverse given the different revenue sharing depending on the location of the advertising. The court agrees. An exclusive sales agency under a contract does not of its own accord create a fiduciary relationship. Courts are reluctant to find such relationships in commercial settings that fall outside of traditional fiduciary relationships such as trustees and beneficiaries, guardians and wards, attorneys and clients and doctors and patients. *See e.g. Teadt v. St. John Evangelical Lutheran*

*Church*, 603 N.W.2d 816 (Mich. Ct. App. 2002); *Farm Credit Servs. v. Weldon*, 591

N.W.2d 438 (Mich. Ct. App. 1998); *Portage Alum. Co. v. Kentwood Nat'l Bank*, 307

N.W.2d 761 (Mich. Ct. App. 1982).  In this case, the court finds that only an ordinary

breach of contract should result from a proven breach of the exclusive sales agent

provision of the sublease.  Furthermore, courts in Michigan do not enforce fiduciary

relationships where the interests of the parties are adverse.  *See e.g. Beaty v.*

*Hertzberg & Golden, P.C.*, 571 N.W.2d 716 (Mich. 1997).  With respect to advertising

revenue, the parties did not have consonant ends.  While Defendant argues accurately

that Plaintiffs would have benefitted from any advertising that gave rise to shared

revenue, Plaintiffs would be comparatively better served if they invested nothing in

attracting shared revenue and instead maximized advertising revenue that they did not

have to share.  As a matter of law, there thus can be no fiduciary relationship between

the parties and, consequently, no such duty that Plaintiffs could have breached.

Plaintiffs are entitled to summary judgment for Counterclaim Count XI.

### IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that all claims against Defendant

Macomb County Parks and Recreation Commission (MCPRC) are DISMISSED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment [157]

is GRANTED IN PART and DENIED IN PART.  It is GRANTED with respect to (1)

Plaintiffs' breach of contract claim for sharing of parking revenue (Count II), (2)

Defendant's' fraud claims (Counterclaim Counts III-V and VII-IX), (3) Defendant's unjust

enrichment claim (Counterclaim Count X) and (4) Defendant's breach of fiduciary duty

claim (Counterclaim Count XI).  It is DENIED with respect to (1) Defendant's breach of

contract claim for parking revenue that was otherwise collected or made complimentary (Counterclaim Count II), (2) Defendant's breach of contract claim for gross ticket revenue that was otherwise collected or made complimentary (Counterclaim Count II), (3) Defendant's breach of contract claim for advertising revenue that was otherwise collected or made complimentary (Counterclaim Count II), and (4) Defendant's breach of contract claim for failure to make payments under the food and beverage agreement (Counterclaim Count VI).

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Dkt # 158] is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to (1) violation of procedural due process pursuant to 42 U.S.C. § 1983 (Count I), (2) violation of equal protection pursuant to 42 U.S.C. § 1983 (Count I), (3) retaliation for exercise of First Amendment rights pursuant to 42 U.S.C. § 1983 (Count I), (4) unlawful conspiracy in violation of 42 U.S.C. § 1985(3) (Count II) and (5) unlawful conspiracy in violation of 42 U.S.C. § 1986 (Count III). It is DENIED with respect to (1) violation of substantive due process pursuant to 42 U.S.C. § 1983 (Count I), (2) breach of contract for parking revenues and security (Count IV) and (3) breach of contract under the food and beverages agreement (Count V).

 s/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  January 29, 2008


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 29, 2008, by electronic and/or ordinary mail.

 s/Lisa G. Wagner_____
Case Manager and Deputy Clerk

(313) 234-5522